IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                          :
UNITED STATES OF AMERICA  :
                          :
                          :
        v.                :   Criminal No. 11-68 (JBS)
                          :
BRANDON ANTHONY,          :
                          :          OPINION
           Defendant      :
                          :
```

APPEARANCES:

Paul J. Fishman
UNITED STATES ATTORNEY
By:  Frances C. Bajada
     Rodney Villazor
Office of the U.S. Attorney
970 Broad Street
Newark, NJ 07102

Maggie F. Moy, Esq.
OFFICE OF FEDERAL PUBLIC DEFENDER
800-840 Cooper Street
Suite 300
Camden, NJ 08102
     Counsel for Defendant

**SIMANDLE,** Chief Judge:

## I.    INTRODUCTION

On the morning of December 3, 2010, pursuant to a search warrant, a joint law enforcement task force searched an apartment in Elizabeth, New Jersey and found a handgun in the rear bedroom. Because Brandon Anthony leases the apartment, the other bedroom belongs to Anthony's roommate, and Anthony's personal effects were found in the bedroom, the Government believes the gun

belongs to Anthony.  Anthony has previously been convicted of a
felony, and has been charged with violation of 18 U.S.C. §
922(g)(1), prohibiting those who have been convicted of a felony
from possessing any firearm in or affecting commerce.  This
criminal matter is before the Court on two of Anthony's pre-trial
motions: to compel the Government to disclose the identity of a
confidential informant whose information was used to support the
search warrant; and to suppress the search as the fruit of a
warrantless dog sniff of Defendant's apartment door, which
Defendant contends is an unreasonable search under the Fourth
Amendment.  [Docket Items 15 & 18.][1]  For the reasons detailed
further in today's Opinion, the Court will deny both motions.

## II.  BACKGROUND

On August 23, 2010, Alcohol Tobacco and Firearms Special
Agent Joshua C. Green conducted an interview with a confidential
informant, who claimed that Defendant Brandon Anthony was a drug
dealer who stored drugs in his apartment.  The informant claimed
to have visited the apartment on a number of occasions as
recently as July 2010, and that on the last visit the informant
saw that Anthony had multiple guns.

---

[1]  On February 8, 2012, this Court convened oral argument on
the omnibus motion filed by Defendant.  As set forth in this
Court's order of that date, Defendant withdrew his motion to
convene a Franks hearing, and the Court granted Defendant's other
motions except for the two under consideration today. [Docket
Item 21.]

A search of Anthony's criminal record revealed a third degree firearms conviction, among others.  Further investigation also revealed that Anthony leased the third-floor apartment identified by the informant.  Following the informant's tip and the subsequent investigation, and with permission of the office manager of the building to enter the common stairwell and hallway, law enforcement officials brought a drug detection dog to the third floor.  The dog alerted to illegal drugs when he sniffed the bottom of the outside of Anthony's apartment door.

On December 1, 2010, the police presented an application for a search warrant to Magistrate Judge Patty Shwartz, who issued the warrant for the third floor apartment.  The warrant was based on the alert from the narcotics canine at the door of the apartment, Anthony's criminal history, and information from the confidential informant.

On the morning of December 3, 2010, law enforcement officers executed the warrant.  Anthony was not home.  The officers found no drugs, but they did recover three firearms: two in Anthony's roommate's bedroom and one in the rear bedroom under the mattress.  Under the same mattress, but located in a separate area, the officers found a motorcycle title belonging to Anthony as well as some dated receipts.

Based on the fruits of the search, Anthony was charged under 18 U.S.C. § 922(g)(1) for possessing a firearm after having been

convicted of a felony.  Anthony now seeks disclosure of the
identity of the confidential informant and the suppression of the
search, arguing that the warrantless dog sniff constituted an
unlawful search forming the basis for the search warrant.


III.  **ANALYSIS**

   **A.  Disclosure of Informant's Identity**

   In order to protect the important role of informants in
crime fighting, the Government has a qualified privilege to
preserve the anonymity of informants from discovery in criminal
matters.  Roviaro v. United States, 353 U.S. 53, 59 (1957).  The
privilege is not absolute, however, and "[t]he scope of the
privilege is limited by its underlying purpose."  Id. at 60.
"[F]undamental requirements of fairness" require that when "the
disclosure of an informer's identity, or of the contents of his
communication, is relevant and helpful to the defense of an
accused, or is essential to a fair determination of a cause, the
privilege must give way."  Id. at 60-61.

   The individual seeking disclosure has the burden of
establishing the significance of the informant's testimony.
United States v. Jiles, 658 F.2d 194, 196-97 (3d Cir. 1981).  To
determine whether fairness requires disclosure in any given case,
the Court must balance "the public interest in the flow of
information against the individual's right to prepare his

4

defense."  Roviaro, 323 U.S. at 62.   The factors the court must consider include "the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."  353 U.S. at 62.

The usefulness of disclosing the informant's identity must be based on more than mere speculation or hope that disclosure will lead to helpful evidence.  See United States v. Bazzano, 712 F.2d 826, 839 (3d Cir. 1983)("[M]ere speculation as to the usefulness of the informant's testimony to the defendant is insufficient to justify disclosure of his identity."); United States v. Brown, 3 F.3d 673, 679 (3d Cir. 1993) ("A defendant who merely hopes (without showing a likelihood) that disclosure will lead to evidence supporting suppression has not shown that disclosure will be 'relevant and helpful to the defense . . . or is essential to a fair determination' of the case.") (quoting Roviaro, 353 U.S. at 60–61).

Defendant offers a series of contentions for why disclosure is warranted, including: the need to challenge the basis for the warrant; the fact that the informant is the only person who claims to have seen Defendant in possession of the firearm; and the need to investigate Defendant's theory that the informant played a role in framing Defendant.  None of these reasons provides a sufficient basis to overcome the qualified privilege.

First, the validity of the search warrant does not turn on

the informant's intentions or mental state.  See United States v.
Brown, 3 F.3d 673, 677-78 (3d Cir. 1993) (holding that it is the
affiant officer's recklessness as to any falsity that may warrant
suppression, not the informant's).  And an informant's identity
cannot be disclosed in order to help the defense make a
preliminary showing of the affiant's untruthfulness.  United
States v. Brown, 3 F.3d 673, 679-80 (3d Cir. 1993).  For these
reasons, the mere desire to examine the basis for an informant's
putatively false claims that led to a search warrant is not
sufficient to merit disclosure.  See McCray v. Illinois, 386 U.S.
300, 312 (1967); United States v. Jiles, 658 F.2d 194, 197 (3d
Cir. 1981) (stating that where "the informant was not an active
participant or eyewitness, but rather a mere tipster," his
identity ordinarily need not be revealed).

     Second, the Government does not intend to introduce the
informant's testimony at trial in order to prove possession;
instead, the Government will present a case for constructive
possession.  Therefore, there is no need to cross-examine the
informant regarding the informant's claimed observations.

     The third and final issue is the question of whether
disclosure is necessary because the informant's identity is
helpful to Anthony's defense involving the gun having been
planted by the informant or the informant's co-conspirator.  This
is the kind of defense theory that does not rise above mere

                                6

speculation or hope.[2]  The only thing preventing this argument
for disclosure from requiring disclosure in every case in which a
conviction involves physical evidence and a confidential
informant is Defendant's challenges to veracity of the
informant's statements.  But the only clear basis for challenging
the informant's credibility, other than Defendant's say-so, is
the fact that there were no drugs found in the apartment, and no
foot traffic to the apartment during the period of surveillance,
six months after Agent Green spoke to the informant.[3]  This does
not suggest that the informant lied, much less suggest that the
informant had some kind of retaliatory animus sufficient to make
Defendant's frame-up theory transcend mere speculation.

    At most, revelation of the informant's identity might
facilitate more specific arguments as to the informant's motive
and opportunity for framing Defendant.  But there is no evidence
that the informant, or anyone, actually planted the gun, and
revealing the informant's identity would not provide that

---

    [2] At oral argument on this motion, Defendant had argued that
the informant could be a jealous or spurned paramour – a woman
likely to have both vengeful motive and the means to access
Defendant's bedroom.  However, the Government revealed that the
informant is male, leading to Defendant revising the theory to
involve an angry boyfriend or family member of the paramour.  The
flexibility of the theory is possible because it is entirely
speculative.

    [3] Defendant also challenges the informant's assertions
regarding the purchase of Defendant's business with drug money,
but adduces no evidence challenging this assertion.

evidence.  The possible revelation of evidence going to motive
and opportunity for a frame-up, in the absence of any other basis
for the defense, is not a firm enough basis upon which to
overcome the Government's qualified privilege.  Cf. United States
v. Gatlin, 613 F.3d 374, 380 (3d Cir. 2010) (concluding that when
informant is alleged to have engaged in conduct creating a
defense for the accused, but revealing the identity of the
informant would not prove that the informant engaged in the
conduct constituting the defense, disclosure was not necessary).

     Nevertheless, out of an abundance of caution, the Court took
the opportunity to review in camera whether the identity of the
informant is more than just speculatively likely to be "relevant
and helpful to the defense of an accused," and asked the
Government to prepare an affidavit disclosing the identity of the
informant and explaining any known facts about the informant that
might be consistent with Defendant's theory.  If the affidavit
had suggested the informant was someone likely to have motive and
opportunity to plant the weapons, then the Court might have a
more difficult task to balance the still somewhat speculative
frame-up defense against the law enforcement interests favoring
the privilege.

     But, as it turns out, the affidavit makes Defendant's theory
appear more unlikely.  As to motive, nothing in the affidavit is
especially suggestive of vengeful motive, but neither does it

8

rule out the informant having some vengeful motive as a
consequence of the informant's relationship to Anthony.  As to
opportunity, however, the affidavit casts significant doubt upon
the ability of the informant to have planted the gun or to have
coordinated with someone who would have had the opportunity to
plant the gun.[4]

Additionally, the affidavit reveals very strong reasons for
the informant to fear for his safety if his identity is
disclosed.  Those reasons were expressed to the investigator and
memorialized in the informant's statement in the days preceding
the search warrant application, so they are not a post hoc
rationalization seeking to keep the identity secret.  It seems
clear that the informant would never have provided this
information unless he was assured that his identity would not
have to be disclosed.

Weighing the relevant factors, the Court concludes that
disclosure is not warranted in this constructive possession case
because it is not more than speculatively likely to help the
defense in its frame-up defense, or otherwise, and is not
essential to a fair determination of the gun charge.  Whatever
small likelihood exists that disclosure would aid Defendant's
frame-up theory is easily outweighed by the risk of harm to the

---

[4]  The Court also examined the informant's criminal history
and determined that it does not contain crimes of dishonesty.

9

informant and the injury to the free flow of information, together with the fact that the Government will not be calling this witness at trial. Therefore, the motion to compel the Government to disclose the informant's identity will be denied.

### C.  Whether Dog Sniff Was a Search

The United States Supreme Court has held that a canine sniff is not a search in the context of sniffing a car at a traffic stop or sniffing luggage. In United States v. Place, the Supreme Court reasoned that a canine sniff of luggage did not constitute a search because "the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited." United States v. Place, 462 U.S. 696, 707 (1983). Stating this legal premise even more categorically in the context of a canine sniff of a car, in Illinois v. Caballes, 543 U.S. 405 (2005) the Supreme Court held that "any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interest.'" Id. at 408 (quoting United States v. Jacobsen, 466 U.S. 109, 123 (1984)).

In other words, what distinguishes a dog sniff from a Fourth Amendment search is that the only private information revealed to

the officers is information in which no person has a legitimate expectation of privacy.  Distinguishing dog sniffs from the kind of thermal imaging search at issue in Kyllo v. United States, 533 U.S. 27 (2001), Justice Stevens wrote for the Caballes majority:

> Critical to [the Kyllo ] decision was the fact that the device was capable of detecting lawful activity—in that case, intimate details in a home, such as 'at what hour each night the lady of the house takes her daily sauna and bath.' The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

Id. at 409-10.

Neither the Supreme Court nor the Third Circuit Court of Appeals has had occasion to apply Caballes to a dog sniff at a private residence, but the majority of authorities point to the "no expectation of privacy in contraband" reasoning from the Supreme Court in holding that dog sniffs are not searches even when the thing being sniffed is the outside of a private residence instead of a car.  See United States v. Scott, 610 F.3d 1009, 1016 (8th Cir. 2010); United States v. Brock, 417 F.3d 692, 696 (7th Cir. 2005); United States v. Reed, 141 F.3d 644, 649-50 (6th Cir. 1998); United States v. Cota-Lopez, 104 Fed. App'x 931 (5th Cir. 2004); United States v. Broadway, 580 F. Supp. 2d

11

1179, 1188-90 (D. Colo. 2008); United States v. Mason, No.
CRIM.A.04-720, 2005 WL 1168369, at *4 (E.D. Pa. May 16, 2005)
("[P]olice use of a drug-sniffing dog is not a search, unless the
dog and/or the police have in some other way, such as by entering
a home, violated an individual's 'legitimate privacy
interest.'").

Before Caballes, the Second Circuit Court of Appeals
distinguished Place when considering dog sniffs of a residence,
finding that even though a sniff "will disclose only the presence
or absence of narcotics, it remains a way of detecting the
contents of a private, enclosed space," and therefore should be
considered a search when the private space is a home.  See United
States v. Thomas, 757 F.2d 1359, 1366-67 (2d Cir. 1985).  But
aside from correctly observing that homes are generally entitled
to greater privacy protections, the Thomas court does not explain
how there can be no legitimate privacy concern with respect to
contraband in a trunk, but some legitimate privacy concern with
respect to contraband in a home.

The legal premise that "governmental conduct that only
reveals the possession of contraband 'compromises no legitimate
privacy interest,'" is not, on its face, a fact-specific judgment
with respect to cars or luggage – or really even a judgment about
privacy expectations; it is a judgment about the legitimacy of
hiding contraband.  From this perspective, there is no reason why

governmental conduct that only reveals the possession of
contraband in a house should be different from governmental
conduct that only reveals the possession of contraband in the
trunk of a car, because the reason for not affording contraband
Fourth Amendment privacy protection has nothing to do with
expectations of what will remain private, and everything to do
with what society is prepared to accept as legitimate privacy.
If there is no legitimate privacy interest in the possession of
contraband, then the fact that activities in the home are given
greater protection is irrelevant, because there is no reason to
think that society is prepared to accept hiding contraband in the
home to be legitimate but not hiding contraband in a car.  Thomas
is therefore not persuasive, especially in light of the Supreme
Court's subsequent reiteration of these principles in Caballes.
See, e.g., United States v. Lingenfelter, 997 F.2d 632, 638 (9th
Cir. 1993) (noting that Thomas's implication "that a person has a
reasonable expectation that even contraband items hidden in his
dwelling place will not be revealed" is inconsistent with Supreme
Court precedent).

        In order to distinguish Caballes, one must either challenge
the Supreme Court's findings about the scope of information
revealed by the sniff or otherwise identify factual circumstances
in which the dog sniff infringes on some interest other than an
interest in hiding the possession of contraband.  This is the

type of distinction the Florida Supreme Court found in <u>Jardines v. State</u>, 73 So.3d 34 (Fla. 2011).  The Court reasoned that even though the revelation of possession of contraband could not invade a privacy interest, the canine sniff outside a home "will invariably entail a degree of public opprobrium, humiliation and embarrassment for the resident, for such dramatic government activity in the eyes of many—neighbors, passers-by, and the public at large—will be viewed as an official accusation of crime."  <u>Id.</u> at 36.  The Court added that if police can conduct suspicionless sniff tests, there was nothing to prevent discriminatory or irrational use of the procedure.  <u>Id.</u>

However, neither reason for distinguishing <u>Caballes</u> is persuasive as applied to the present facts.  First, the Florida Court's conclusion that sniffs "will invariably entail a degree of public opprobrium, humiliation and embarrassment for the resident" is less applicable to the facts of this case, in which the sniff occurred away from the plain view of the general public inside a common area of a multi-family residence with the permission of the owner.  Nothing in the record suggests anyone but the landlord was privy to the presence of police activity, much less aware of the particular apartment being sniffed. Similarly, this Court is not asked to determine whether police presence with a dog on the curtilage of a home without permission involves some intrusion into privacy not present in <u>Caballes</u> or

14

<u>Place</u>.  Instead, this situation involves police presence in a common area with express permission to be there.

Additionally, it is not clear why the presence of adverse public reaction to the putative search is relevant to the Supreme Court's prescribed method for determining whether certain conduct constitutes a search.  Plenty of permissible police conduct may lead to adverse inferences by uninformed members of the public – such as the replication of the facts in <u>Jardines</u> but with officers simply knocking on the door and asking questions instead of having a dog – but this does not form the basis for considering the conduct to be a search because it does not involve an individual's reasonable expectation of privacy. Intrusiveness of a search is relevant to the reasonableness of the search, an inquiry that occurs after the threshold question of whether some conduct constitutes a search is answered in the affirmative;  to read intrusiveness retroactively into the question of whether conduct is a search mis-applies the Fourth Amendment inquiry.  <u>Cf. United States v. Place</u>, 462 U.S. 696, 703 (1983) (explaining that once it is determined that certain conduct constitutes a "seizure" within the meaning of the Fourth Amendment, "We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.").

15

The _Jardines_ Court's other reason for distinguishing
_Caballes_ was the Court's finding that if police can conduct
suspicionless sniff tests, there was nothing to prevent
discriminatory or irrational use of the procedure.[5]  But
government conduct must be both rational and not invidiously
discriminatory under the Fourteenth Amendment, and concern about
widespread or capricious suspicionless sniffing would be equally
present in _Caballes_ and _Place_, so it is an odd basis upon which
to distinguish those cases.[6]  More fundamentally, this argument
begs the question about whether the sniff is a search: if a sniff
invades no legitimate privacy interest, then there is no Fourth
Amendment injury resulting from the use of dog sniffs "based on
whim and fancy," as the Florida Court put it.

In short, since this Court applies the Supreme Court's legal
premise that there is no legitimate privacy interest in the
possession of contraband, and because nothing in the record calls
into question the factual premise that nothing is revealed other
than possession of contraband by a dog sniff, the Court is

---

[5]  Nothing in this case suggests that the narcotics dog was
deployed in a random or arbitrary manner.  This specific
apartment door was targeted based upon the information developed
in the police investigation of illegal activity in this
particular location.

[6]  Indeed, Justice Ginsburg's dissent in _Caballes_ cites
concern about widespread suspicionless dog sweeps for dissenting
from the majority opinion.  _Illinois v. Caballes_, 543 U.S. 405,
422-23 (2005) (Ginsburg, J., dissenting).

compelled to conclude that the dog sniff in this case did not constitute a Fourth Amendment search.

## IV. CONCLUSION

Defendant has not made a sufficient showing that disclosure of the informant's identity is relevant and helpful to his defense or essential to a fair trial.  Nor has Defendant demonstrated that the use of a narcotics canine in this case constituted a violation of the Fourth Amendment.  Therefore, Defendant's motions will be denied.

The accompanying Order will be entered.

__ March 20, 2012 __                    __ s/ Jerome B. Simandle __
Date                                    JEROME B. SIMANDLE
                                        Chief U.S. District Judge